### OF THE

## STATE OF MISSOURI

### AT THE

## APRIL TERM, 1923.

*(Continued from Vol. 299.)*

## WILSON COMPANY v. HARTFORD FIRE INSURANCE COMPANY, Appellant.

### Division Two, July 14, 1923.

1. **RES ADJUDICATA:** Dismissal upon Motion for Judgment on Pleadings: Bar to Subsequent Suit. By express statute of New York a judgment of dismissal of an action entered upon a motion for a judgment on the pleadings, dismissed because the complaint did not contain allegations showing defendant's liability, does not prevent a new action for the same cause, unless it expressly so declares, or it appears by the judgment roll that it was rendered upon the merits; and the New York judgment of dismissal containing no recital that it is an adjudication on the merits is not a bar, in such case, to proper action on the merits brought in Missouri, but in effect was nothing more than a nonsuit, or a judgment upon a demurrer to a petition lacking in essential allegations.

2. **DEFECT OF PARTIES:** Legal Capacity to Sue: No Demurrer: Waiver. Where the action is brought in the name of the real party in interest and the petition contains allegations which defendant contends show an express trust, the objection that the action should have been brought in the name of the trustee and that plaintiff has no legal capacity to maintain it, should be raised by demurrer and cannot be effectively raised by answer, and if not raised by demurrer must be considered waived. The statute requiring a defect of parties to be assailed by demurrer is imperative.

3. ——: ——: Trustee of an Express Trust. The statute (Sec-1156, R. S. 1919) defines the party in whose name a contract is made for the benefit of another as a trustee of an express trust, and declares that the trustee may sue in his own name; but that is only a permissive statute, and must be considered an exception to Section 1155, which is general and clearly says that every action shall be prosecuted in the name of the real party in interest. The two sections, when read together, mean that an action on a contract made for the benefit of another may be maintained in the name of either the trustee or the beneficiary.

4. ACCORD AND SATISFACTION: Insurance for Members of Exchange: Settlement with Some: Rights of Others. An insurance policy indemnifying three hundred members of a stock exchange against loss of cattle by fire was issued in the name of the exchange "for the account of whom it may concern," the loss if any to be paid to the president of the exchange. *Held,* that a payment to the exchange in satisfaction of the losses of some of the members did not release the insurance company from liability to others whose losses had not been adjusted, especially where the company clearly understood that such unadjusted losses were not included in the payment. A payment by a debtor of one or more liquidated claims does not constitute a consideration requiring the creditor to release other similar unliquidated claims, even though all the claims were based on one general contract made for the benefit of many persons engaged in similar but separate transactions.

5. INSURANCE: Presentation of Claim: Denial of Liability. An unqualified denial of liability on its fire policy by an insurance company dispenses with the requirement for presentation of a claim for losses, especially where the company bases its denial upon the existence of other specific insurance held by the insured, and induces the committee selected to adjust the loss to postpone any award until it is determined whether such other insurance absolves it from liability.

6. ——: Blanket Policy: Apportionment of Loss. A fire policy embodying compound or blanket insurance covers and attaches to every item of property described therein, and if the loss of one item exhausts the whole amount of the policy the entire insurance must be paid and there can be no apportionment. Such a policy insures the property collectively without providing, in the event of a loss, for a distribution of the insurance to each item.

7. ——: ——: Specific: Amount Not Stated. It is not necessary to state in the fire policy the entire amount of the insurance where the conditions of the contract are dependent upon the amount to be covered and a definite method is prescribed by which the

amount of the loss of each person entitled to indemnity may be ascertained. A policy issued to a stock exchange indemnifying its three hundred members against loss of cattle by fire as their interests might appear, which definitely located the cattle in a certain stockyards, divided them into classes, prescribed a definite limit of liability for each head of the class, prescribed a premium rate, and gave to each owner the attendant right of action in case of loss, was specific insurance, although the entire amount of insurance was not named.

8. ——: **Specific: Designating Name of Insured.** It is not necessary to the validity of a contract of insurance that it contain the name of the insured, nor does the designation of his name characterize the policy as specific insurance.

9. ——: **Specific Blanket Insurance: Nullified by Other Existing Floating Insurance.** The defendant issued the policy sued on to a stock exchange, "for the account of whom it may concern," by which it indemnified the three hundred members thereof, one of whom was plaintiff, against loss by fire of cattle and calves in a certain general stockyards, intending thereby "to cover the interest of the members of the above mentioned exchange" in an amount not in excess of $150 per head on cattle and $50 per head on calves while "located in the yards," and the policy further provided that "if there be any specific insurance on the live stock above described then this policy shall apply only after such specific insurance is exhausted." At that time plaintiff had a floaters' or blanket insurance policy in another company indemnifying plaintiff and ten or twelve subsidiary corporations, in different states, some named and others unnamed, against direct loss by fire of cattle and other stock, wherever located in the United States, wherein it was provided that insurance in the amount of $2,250,000 is "to be considered as surplus insurance on the property insured, and this insurance shall not apply or contribute until the amount collectible from all such specific insurance shall have been exhausted" and that "the insured is to be reimbursed to the extent of the difference between the amount collectible from such specific insurance and the amount of the actual loss sustained by the insured." *Held*, that this last policy was not specific insurance, and did not relieve the defendant from liability on the policy sued on; that the policy sued on was specific insurance, and the other was floating or surplus insurance, upon which the insurer did not become liable until the specific insurance sued on was exhausted.

10. ——: **Floating.** A floating insurance policy is one intended to supplement specific insurance on property, and attaches only when the specific insurance ceases to cover the risk. Its purpose is to provide indemnity against loss of property which because of its frequent change in location and quantity cannot be covered

by specific insurance. By its terms it does not become operative until the prior insurance has been exhausted.

11. ———: Avoided by Other Insurance: Condition of Forfeiture. To constitute a successful defense to an action on an insurance policy it should appear that the other policy relied upon to avoid the one containing the condition of forfeiture was in existence and enforceable at the time of the loss.

12. ———: ———: ———: Warranties. Stipulations in insurance policies in the nature of warranties or conditions for forfeiture are to be reasonably construed with reference to the subject-matter, and not capriciously or literally. If the condition does not affect the substantial right of the insurer during the existence of the risk, it cannot be invoked to invalidate its contract.

13. ———: ———: Statute: Warranties: Equal Only to Representations. Under the statute (Sec. 6234, R. S. 1919) declaring that "the warranty of any fact or condition hereafter incorporated or made a part of any fire . . . policy of insurance purporting to be made or assented to by the assured which shall not materially affect the risk insured against, shall be deemed . . . as representations only," a stipulation in the policy sued on against other insurance not material to the risk is a representation only and does not avoid such policy.

14. ———: ———: Stipulation Against Specific Insurance: Prorating Claim. Where the policy sued on constitutes specific insurance and contains a stipulation relieving the insurer from liability if there be any specific insurance, the amount contracted by it to be paid must first be exhausted before a prior blanket or floating policy issued by another company can have any application; and hence any provision in the policy concerning the prorating of the insurance is irrelevant.

15. ———: Cattle and Calves: Valuation by Groups Instead of by Head. Where the policy insured cattle at not to exceed $150 per head and calves at not to exceed $50 per head, and the evidence establishes that 1434 cattle and calves were lost in the fire which destroyed the stockyards, it was not error to permit the insured to establish their value by groups, in which manner they were bought, since the most practicable method of ascertaining the average market value of the average animal in a lot of cattle and calves bought and sold at public stockyards is to divide the total cost of the particular lot by the number of head therein.

16. ———: Calves: Classification: According to Weight. It is not error to classify as cattle animals weighing from 600 to 1040 pounds, although it was customary in the stockyards to classify all animals bought by calf-buyers as calves, and the said animals were bought by a calf-buyer.

Wilson Company v. Hartford Fire Insurance Co.

17. ———: Salvage of Insured Property: Retention of Proceeds. Where the insurance company, after the fire, in the stockyards, took possession of the injured animals and salvaged and sold them, the fact that it retained the proceeds and refused to make reparation to the insured becomes an academic question in view of a holding that it is liable on its policy for the amount of the loss and damage.

Appeal from Jackson Circuit Court.—*Hon. Willard P. Hall*, Judge.

AFFIRMED.

*Guthrie & Conrad* and *Bates, Hicks & Folonie* for appellant.

(1) (a) Under the practice in New York a motion for judgment on the pleadings, such as was here proven, is in effect a trial of the action upon the pleadings. The practice is analogous to that upon demurrer. Schleissner v. Goldsticker, 120 N. Y. Supp. 333. Such dismissal of the complaint is a determination of the merits as concludes the parties and estops them from further litigating such issues thereafter. Hamilton Building Assn. v. Reynolds, 5 Duer, 671; Bouchaud v. Dias, 3 Denio (N. Y.) 238. (b) The law will not tolerate determination of issues afresh, when the parties have previously submitted them to a competent court and secured its judgment. Judgments on the merits of a controversy are as binding when arising on motion or demurrer as when they are rendered upon sworn evidence before a jury. Johnson v. United Rys., 243 Mo. 290; Buchanan v. Smith, 75 Mo. 463; Chouteau v. Gibson, 76 Mo. 38; Conn. Ins. Co. v. Smith, 117 Mo. 296; Mut. Life Ins. Co. v. Smith, 117 Mo. 297; Gould v. Evansville Railroad Co., 91 U. S. 533; Alley v. Knott, 111 U. S. 475; Bissell v. Spring Valley Township, 124 U. S. 225; Mitchell v. Bank, 180 U. S. 471; Truesdale v. Trust Co., 67 Minn. 454; Oregonian Railway v. Navigation Co., 27 Fed. 277; Roberts v. Moss, 17 L. R. A. (N. S.) 280. (c) If a contract is construed or a party is determined not to be entitled to its benefit, such determination or construction is conclusive in subse-

quent controversies. Freeman on Judgments (4 Ed.) sec. 256, p. 460; Black on Judgments, secs. 504, 729, 1021; Bigelow, Estoppel (6 Ed.) p. 100; Outram v. Moorewood, 3 East, 346; Dunseth v. Elec. Ry. Co., 41 Mont. 22; Markley v. People, 171 Ill. 260. (2) The contract sued upon is creative of an express trust which makes the president of the Kansas City Live Stock Exchange and such exchange, active trustees of an express trust, who are vested with the legal title to any cause of action which may arise by reason of breach by appellant or coming into existence of obligations of appellant to pay. No cause of action is intended by the contract, nor does it exist, in favor of Wilson & Company, because of membership in such exchange. (a) If any claim could under any circumstances arise and accrue to Wilson & Company in its own name against Hartford Fire Insurance Company, it could only do so in the event that it made demand upon Kansas City Live Stock Exchange or its president or other officers, demanding that they prosecute the duties of their trust by making claim upon the insurer, and if necessary, suing the insurer, and refusal of the trustee to act, or such failure to act as would be the equivalent of a refusal. (b) The provision of the policy sued upon providing that loss under such policy was to be adjusted with and payable to president of the Kansas City Live Stock Exchange was a lawful provision and one favored by the law, being designed to prevent a multiplicity of actions and prompt and expeditious adjustment and settlement of loss. R. S. 1919, secs. 1155, 1156; Harrigan v. Welch, 49 Mo. App. 504; Considerance v. Brisbane, 22 N. Y. 389; Albany v. Lundberg, 121 U. S. 454; Canada v. Daniel, 175 Mo. App. 55; Landwerlen v. Wheeler, 106 Ind. 523; Meridan Bank v. Hauser, 145 Ind. 496; Symmers v. Carroll, 207 N. Y. 632; Clark v. Fordike, 118 N. Y. 7; Taylor v. Davis, 110 U. S. 334; Gardner v. Armstrong, 31 Mo. 535; Gibbons v. Gentry, 20 Mo. 469; Hitch v. Stonebraker, 125 Mo. 138. (c) The duty of collecting and paying over money to beneficiaries

renders a trust active and removes it from the domain of passive trusts. Mason v. Mason, 219 Ill. 609; Williams v. Gooch, 115 Wis. 576; Vant Zandt v. Garritson, 21 R. I. 352. (3) The allegation that Kansas City Live Stock Exchange has no interest in the sum for recovery of which suit is brought, does not answer the legal requirements for investiture of plaintiff with a right of action. Demand upon the trustee that it sue, and refusal so to do are essential to be alleged and proven. Woolf v. Burns, 93 N. Y. Supp. 219. (4) The provision of the policy sued upon, that unless otherwise provided by agreement added thereto the policy should be void, if the assured then had or thereafter procured any other contract of insurance, whether valid or not, is a valid and enforceable provision. The policy in question was invalidated by existence of policy of Globe & Rutgers, unless the latter may be classed as "specific insurance," which this policy permits. If specific then, as such policy is adequate to duly indemnify plaintiff, it may not recover herein. Ætna Fire Ins. Co. v. Tyler, 15 Wend. (N. Y.) 400; Sheets v. Iowa State Ins. Co., 153 Mo. App. 633; Dolan v. Ins. Co., 88 Mo. App. 666; Woolford v. Phoenix Ins. Co., 190 Mass. 233; Allen v. Ins. Co., 123 N. Y. 14; Phoenix Ins. Co. v. Lamar, 106 Ind. 573; Phoenix Ins. Co. v. Copeland, 90 Ala. 386. (5) The policy sued upon provides that if there be any specific insurance on live stock described, then this policy shall apply only after such specific insurance is exhausted. Insurance of Globe & Rutgers Fire Insurance Company was specific insurance on such live stock and was not exhausted. (a) The policy of appellant covered all of the live stock of all persons having live stock upon the premises of the Kansas City Stock Yards. Specific insurance in relation to such blanket coverage means the insurance of a portion of persons or property so comprehended to the exclusion of the remainder. Policy of Globe & Rutgers Fire Insurance Company insures only one of three hundred and seven persons insured by policy of appellant and insured only

the cattle of Wilson & Company, less than 2,000 in number, out of 46,000 head of cattle upon the premises in question. (b) The terms "blanket insurance" and "specific insurance" are relative terms, which require in each case the consideration of two factors or insurances. The policy of Globe & Rutgers Fire Insurance Company insuring cattle of Wilson & Company wherever located in the United States, in so far as the property now under consideration is concerned, was an insurance of all the cattle Wilson & Company had in Kansas City Stock Yards. It would be blanket insurance as compared with a policy of insurance of another insurer insuring one specified head of cattle belonging to Wilson & Company and not insuring their other cattle, and would be blanket insurance as compared with another policy which insured Wilson & Company's hogs, whereas, the Globe & Rutgers policy insured all the hogs and cattle. When considered in relation to the policy of appellant, which insured the property of 307 persons, whereas, Globe & Rutgers insured only one of them, Wilson & Company; policy of Hartford Fire Insurance Company was blanket and that of Globe & Rutgers was; so considered comparatively, specific. Ins. Co. v. Refrig. Co., 162 Ill. 322.; Peters v. Banta, 23 N. E. 85; Curiel v. Beard, 44 Fed. 553. (6) The appellant was released by formal release of the trustee and additionally by release and discharge upon the draft. This release was proven and offered in evidence by plaintiff. It operated to entirely discharge the appellant from all claims of Kansas City Live Stock Exchange and its membership. 39 Cyc. 323; Perry on Trusts, sec. 482; Thomassen v. Van Wyngaarden, 65 Iowa, 687; Creighton v. Pringle, 3 S. C. 77; Radcliffe v. Winch, 17 Beav. 216. (7) The appellant having insurance upon every head of cattle upon the premises and having agreed with Kansas City Live Stock Exchange to pay all claims approved by its committee for fire loss, had a legal right to take possession of intermingled cattle to preserve the value of them, and had a right for

protection of its interest therein (acknowledging responsibility to pay a great number of claimants), to make disposition of the cattle, subject only to obligation to account for a proportion of the proceeds to any other person establishing their rights therein. The adjustment plan adopted was the only one practical under the circumstances. There was no waiver, because there was no intentional abandonment or relinquishment of a known right. There was no intentional abandonment, and the supposed right is unknown. The claims of respondent savor more of waiver than of estoppel. 21 C. J. 1115-1116; Roberts v. American National Ins. Co., 220 S. W. 1000; Stiple v. German American Mutual Life Assn., 55 Mo. App. 224. Waiver is purely a matter of intention. Michigan Savings & Loan Assn. v. Trust Co., 73 Mo. App. 165. Full knowledge of material facts is essential to a waiver. Harrison v. McReynolds, 183 Mo. 542; Reed v. Bankers Union, 121 Mo. App. 426; 21 C. J. 1205. The facts herein are not creative of either waiver or estoppel. Wiser v. Central Business Men's Assn., 219 S. W. 102; American Ins. Co. v. Barnett, 73 Mo. 364; Benson v. Ins. Co., 161 Mo. App. 480; Wrightmuller v. Fire Assn. of Phila., 38 Mo. App. 118; Rathmore v. Fire Assn. of Phila., 20 Mo. App. 246; Madison v. Ausmuss, 50 Mo. 551. The essentials of an estoppel are entirely lacking herein. 16 Cyc. 680; DeLashmutt v. Teetor, 261 Mo. 441. No prejudice resulted to respondent. 16 Cyc. 722-3. (8) If the clause providing for prorating with other insurance is applicable, then the policy of Globe & Rutgers must prorate upon the basis of the face amount of that policy. Page v. Sun Ins. Co., 74 Fed. 203; Farmers Feed Co. v. Ins. Co., 173 N. Y. 241; Kansas City Paper Box Co. v. Ins. Co., 100 Mo. App. 691.

*Watson, Gage & Ess, Clifford G. Roe* and *William R. Brown* for respondent.

(1) The order dismissing the complaint of the respondent in the action brought in New York was not a

final adjudication on the merits as to the issues involved in the action at bar. N. Y. Civil Code, secs. 547, 1209; Thorne v. Debreteuil, 83 N. Y. 855; Shaw v. Broadbent, 129 N. Y. 114; Ross v. Hawley, 141 N. Y. 375; Converse v. Sickles, 146 N. Y. 208; In re Durand, 147 N. Y. 395; Reynolds v. Ins. Co., 160 N. Y. 651; Genet v. Canal Co., 163 N. Y. 178; Genet v. C. & H. C. Co., 170 N. Y. 278; Rugg v. Cornell, 171 N. Y. 114; Clark v. Levy, 114 N. Y. Supp. 890; Ship v. Friedenburg, 117 N. Y. Supp. 599; Standard Fashion Co. v. Thompson, 122 N. Y. Supp. 300; Emanuel v. Walter, 123 N. Y. Supp. 481; Long-necker v. Longnecker, 140 N. Y. Supp. 43. (a) Under the New York statutes, to which full faith and credit must be given, as the judgment roll offered in evidence did not "expressly declare" that it was rendered "upon the merits," the judgment dismissing the complaint "does not prevent a new action for the same cause of action," and was inadmissible in evidence. Genet v. C. & H. C. Co., 170 N. Y. 278; N. Y. Civil Code, sec. 1209. (b) Apart from statutory expression of the rule as in New York, courts both of Missouri and elsewhere agree that a judgment of dismissal on demurrer on the ground that the petition failed to state a cause of action will not sustain a plea of *res adjudicata* to a petition in which the essential allegation lacking in the former complaint is supplied. The former adjudication in such case determines no more than that the pleading as presented was insufficient and not that the plaintiff had no cause of action. Wells v. Moore, 49 Mo. 229; Bennett v. Southern Bank, 61 Mo. App. 297; Shanklin ex rel. Wetzler v. Francis, 67 Mo. App. 457; Coleman v. Dalton, 71 Mo. App. 14; Swing v. Karges Furniture Co., 150 Mo. App. 57; Wing v. Union Ins. Co., 167 Mo. App. 14. (2) This action was properly brought by respondent in its own name. Any objection thereto appearing upon the face of the petition should have been raised by demurrer and not by an answer. Otherwise it is waived for all purposes. (a) The respondent was the real party in in-

terest and was the proper party plaintiff in this action. R. S. 1919, secs. 1155, 1156; Plahto v. Ins. Co., 38 Mo. 251; Rogers v. Gosnell, 51 Mo. 466; McComus v. Ins. Co., 56 Mo. 573; Snyder v. Express Co., 77 Mo. 523; Chouteau v. Boughton, 100 Mo. 411; Ellis v. Harrison, 104 Mo. 277; St. Louis ex rel. v. Von Phul, 133 Mo. 561; Beattie Mfg. Co. v. Girarde, 166 Mo. 154; Applegate v. Railroad Co., 252 Mo. 173; Anthony v. Ins. Co., 48 Mo. App. 65; Brannigan v. Jefferson Ins. Co., 102 Mo. App. 73; Griffin v. Railway, 115 Mo. App. 549; Still v. Ins. Co., 185 Mo. App. 558; DeGiverville Land Co. v. Thompson, 190 Mo. App. 701; Silverthorn & Co. v. Mfg. Co., 190 Mo. App. 729. (b) A defect of parties plaintiff, if any, was apparent on the face of the petition, the pertinent allegations of the policy being recited in the petition, and not having been taken advantage of by demurrer, was waived by appellant's filing its answer. R. S. 1919, secs. 1226, 1230; State to use v. Sappington, 68 Mo. 454; Johnson v. United Rys., 247 Mo. 328; Wolz v. Venard, 253 Mo. 84; Rideout v. Burkhardt, 255 Mo. 116; Phinney v. Randall, 68 Mo. App. 557; Van Stewart v. Miles, 105 Mo. App. 246; Keele v. Railroad, 151 Mo. App. 372; Canada v. Daniel, 175 Mo. App. 55; Mfg. Co. v. Milling Co., 179 Mo. App. 87. (3) The payment of the amount named in the draft of appellant to the Kansas City Live Stock Exchange in satisfaction of losses then adjusted and liquidated, does not discharge the liability of appellant to Wilson & Company under this policy. (a) It is not supported by a valid consideration. Stewling v. Tacke, 112 Mo. App. 418; Rogers v. Foundry Co., 167 Mo. 251; Hawkins v. Railroad, 182 Mo. App. 338; Harms v. Casualty Co., 172 Mo. App. 241; Bunge v. Koop, 48 N. Y. 225; Miller v. Coates, 66 N. Y. 610; Harriman v. Harriman, 12 Gray (Mass.) 341. (b) The agreement entered into at the same time did not purport on its face to satisfy all claims as to the individual owners insured, but required the Kansas City Live Stock Exchange and the members thereof to enter this stipulation. No release

from Wilson & Company was obtained or offered in evidence. (c) McCoskey, the agent for the appellant, stated that it was not intended by this payment to settle the Wilson & Company's claim against appellant and it was so understood by the Hartford Insurance Company at the time the draft was paid. (d) Appellant in paying said draft intended nothing more than to pay its conceded indebtedness. Rogers v. Foundry Co., 167 Mo. 251. (e) Appellant, approximately a week before the payment was made in settlement of adjusted losses, referred Wilson & Company to its Chicago attorneys to settle the controversy as to whether there was any specific insurance which would relieve the Hartford from paying Wilson & Company, and the attorneys had that matter of liability under consideration at the time said alleged receipt was given and draft executed. (4) The refusal of the appellant to permit the presentation of respondent's claim of loss, on the ground that Wilson & Co. had specific insurance on the live stock insured by appellant and the subsequent denial of liability by the appellant on the sole ground that specific insurance existed, operates as a waiver of any right the appellant might have had to insist on adjustment of the claim with the president of the exchange or that suit be instituted in the name of the exchange or president thereof instead of in the name of the respondent. Andrus v. Ins. Co., 168 Mo. 161; Dautel v. Ins. Co., 65 Mo. App. 50; Thomas v. Ins. Co., 78 Mo. App. 272; Vining v. Ins. Co., 89 Mo. App. 311; Fuller Bros. v. F. & C. Co., 94 Mo. App. 496; Seigle & Sons v. Lumber Co., 106 Mo. App. 112; Hood v. Hartshorn, 100 Mass. 121; Phippen v. Stickney, 3 Metcalf (Mass.) 389; Mutual Fire Ins. Co. v. Alvord, 61 Fed. 752, 9 C. C. A. 623; Reed v. Ins. Co., 138 Mass. 576. (5) The policy issued by the Globe & Rutgers Fire Insurance Company is what is known as a "floating policy" for a gross amount, to-wit, $2,250,000, at a gross premium covering property of general description wherever located in the United States. It did not constitute

specific insurance, as that term is used in the policy issued by appellant. (a) The Hartford policies are specific insurance insuring each specific head of live stock, cattle at $150 per head and calves at $50 per head at a specific location at a specific premium, ten cents per car, paid on each specific carlot of live stock. (b) The Globe & Rutgers policy is surplus insurance and does not attach to or reach that interest in the live stock which was covered by the policies sued on. Peabody v. Liverpool, London & Globe Ins. Co., 171 Mass. 115; Cutting v. Ins. Co., 199 Mass. 380; Fairchild v. Ins. Co., 51 N. Y. 65; Fire Ins. Co. v. Merchants & Miners Ins. Co., 66 Md. 339; Merrick v. Ins. Co., 54 Penn. 377; Klotz Tailoring Co. v. Ins. Co., 102 N. Y. Supp. 82, 116 App. Div. 723; Home Ins. Co. v. Baltimore, 93 U. S. 527; American Central Ins. Co. v. London, 62 N. Y. Eq. 73; Ins. Co. v. Refrigerating Co., 162 Ill. 322. . (6) The pro-rating clause contained in the policies sued on has no application in this case. Appellant's method of prorating general and specific insurance is not the method most generally accepted by the courts. Sloat v. Royal Ins. Co., 49 Pa. 14; Ogden v. East River Ins. Co., 50 N. Y. 388; Chandler v. Ins. Co., 70 Ver. 562; Blake v. Ins. Co., 12 Gray, 265; Meigs v. Ins. Co., 205 Pa. 378; Ziegler v. Com. Union Assn., 38 Pa. (Sup.) 532. (7) It was not error to permit respondent to prove value of each animal by proving the value of the live stock in groups. (a) Appellant's construction of its policy in adjusting all other claims was that proof of groups of cattle was a proper method of arriving at the value of each animal lost in this fire. (b) The undisputed testimony established that cattle valued in groups were purchased in groups, the cattle in each lot being of like quality and character and weight. (c) There was no recovery on any one animal in excess of the specific insurance of $150 on cattle and $50 on calves. (8) (a) The Globe & Rutgers policy indemnifying against "direct loss and damage by fire," does not cover any loss arising through the mixing of two or more own-

ers' live stock in removing them to a place of safety in the event of fire. Spence v. Union Marine Ins. Co., L. R. 3 C. P. 427. (b) The courts in this country hold without exception that when by mistake or accident goods of different owners are so mixed together as to be indistinguishable, such owners do not suffer a loss of the goods or the title thereto, but become tenants in common of the intermingled goods in the proportion which they severally contributed to it. Jones v. Moore, 4 Y. & C. Exch. 351; Robbins v. Jackson, 13 Manitoba, 28; Reid v. King, 89 Ky. 388; Martin v. Mason, 78 Me. 452; Ryder v. Hathaway, 21 Pick. (Mass.) 305; Keweenaw Assn. v. O'Neil, 120 Mich. 270; Davis v. Krum, 12 Mo. App. 279; Manti C. S. Bank v. Peterson, 33 Utah, 209; Pratt v. Bryant, 20 Vt. 333; Hasseltine v. Stockwell, 30 Me. 241; Home v. Hanson, 68 N. H. 201; Ayre v. Hixson, 53 Ore. 19; Belcher v. Cassidy, 26 Tex. Civ. App. 60. And the owner may maintain replevin to recover his goods. Kaufmann v. Schilling, 58 Mo. 218; Lead Co. v. White, 106 Mo. App. 222; Blurton v. Hansen, 135 Mo. App. 548; Meeks v. Mining Co., 141 Mo. App. 648. (9) The sale by the appellant of the salvaged cattle belonging to the respondent and the retention by the appellant of the proceeds of the salvaged property after knowledge of the existence of the Globe & Rutgers policy and its terms, is a waiver of any and all defenses arising by reason of the existence of said policy and the appellant is estopped from denying liability for the full amount of the loss. Fire Insurance, 26 C. J. p. 338, sec. 427; 3 Cooley on Insurance, p. 3745; First Natl. Bank v. Manchester Ins. Co. 64 Minn. 98; Devils Lake Bank v. Lancashire Ins. Co., 65 Minn. 452.

WALKER, J.—This action is based on a contract of insurance executed by appellant in the form of two separate policies indemnifying owners of live stock in the Kansas City stockyards against loss by fire or as the result of mixing the live stock of two or more owners

in removing same to a place of safety in the event of fire. One policy related to live stock on the Missouri or native side of the Kansas City stockyards, and the other to live stock on the Kansas or quarantine side of said stockyards. These policies were identical in form and substance, except as to the description of the location of the insured property.

The loss complained of arose out of a fire occurring in October, 1917, at the said stockyards. This fire destroyed the northern portion of the native or Missouri side of the stockyards at a time when from 46,000 to 47,000 head of cattle were yarded therein. Of these cattle, 20,394 were released from the pens and were afterwards salvaged by the appellant selling them at a public sale for the sum of $1,030,185.50; 921 head, injured by the fire, were sold by the appellant for the sum of $4,616.-12; and 11,449 head were destroyed in the fire. The balance of the cattle in the southern portion of the yards were not injured, nor released from the pens. The cattle belonging to the respondent in the yards at the time of the fire were outside of the fire limits, and the calves were at the very edge thereof, and were not burned, but were all released from their pens during the fire, and became a part of the salvaged cattle which the appellant gathered and sold at public sale. The proceeds of such sales, the appellant received and has ever since retained.

After a trial, in which the issues were presented to a jury, a verdict was rendered in favor of the respondent on each count of its petition, and judgment rendered thereon. The verdict on the first count, which related to 680 head of cattle and 608 head of calves, lost on the Missouri side of the yards, was for the sum of $63,542.55. On the second count, which related to the loss on the quarantine side of the yards in Kansas, the verdict was for $5,415.91, and represented the value and cost of 108 calves and 38 cattle.

Appellant's policies, dated December 5, 1914, were issued to the Kansas City Live Stock Exchange "for

the account of whom it may concern." The specific agreements as to coverage and liability in the first policy describe the character of the live stock covered as "cattle, calves, hogs, sheep and goats, located on the premises of the Kansas City Stockyards Company of Missouri" and in the second policy "on the premises of the United States Quarantine Stockyards Company of Kansas." These specific provisions, among others, were incorporated in the policies: "The Kansas City Live Stock Exchange. For the account of whom it may concern. On live stock, consisting of cattle, hogs, calves, sheep or goats, on the premises of the Kansas City Stockyards Company of Missouri, or in railroad cars on track adjacent thereto, situated in Kansas City, Missouri, and to continue while the property insured is under the control of any member of the above Exchange or of the Kansas City Stockyards Company of Missouri.

"This insurance is intended to cover the interest of the members of the above mentioned Exchange and the shippers whom they represent, and also the interest of purchasers while this stock remains in the yards.

"It is agreed and understood that in case of loss, the liability of this company shall not be in excess of $150 on any one head of cattle, $35 on any one hog, $50 on any one calf, $15 on any one sheep or goat. . . .

"All live stock, as above described, located in the yards, buildings or on the grounds of the Kansas City Stockyards Company of Missouri, under the control of any member of the above Exchange or of the Kansas City Stockyards Company of Missouri is covered by this insurance. . . .

"It is specifically understood and agreed that if there be any specific insurance on live stock as above described then this policy shall apply only after such specific insurance is exhausted. . . .

"It is the intent of this contract to cover any loss arising through the mixing of two or more owners' stock and removing them to a place of safety in the event of fire to the property. . . .

"Loss under this policy to be adjusted with and payable to C. T. McCoun, president, or his successor in office, for the use and benefit of the owners of property injured or destroyed. . . .

"This insurance is intended to cover the interests of members of the above Exchange and shippers whom they represent and interest of the purchasers while the stock remains on the premises of Kansas City Stockyards Company or in cars on tracks adjacent thereto, and also the interest of the Kansas City Stockyards Company and the owners of live stock which it represents, including direct shipments and stock temporarily in said yards for rest, feed and water.

"This insurance shall cover and be for the benefit of all owners or persons interested and this policy is written in the name of Kansas City Live Stock Exchange for convenience, but shall inure to the benefit of all persons owning or interested in said live stock as their interests may appear and shall have the same binding force as if their names were written herein."

The appellant denied liability and refused to adjust the loss, either through the Kansas City Live Stock Exchange or its president or directly with the respondent, upon the sole ground that the latter had in force at the time of the fire a certain policy of insurance issued by the Globe & Rutgers Fire Insurance Company. Liability was denied on the ground that the policy issued by that company covered stock owned by Wilson & Company in the Kansas City stockyards, and was specific insurance within the meaning of that term as used in the policies issued by appellant. This policy issued by the Globe & Rutgers Fire Insurance Company was a blanket or "floaters' policy," indemnifying Wilson & Company and twelve or thirteen other distinct corporations subsidiary to Wilson & Company, both named and unnamed, against direct loss or damage by fire to real or personal property, including hogs, cattle, sheep or poultry, wherever located in the United States of America, with the ex-

300 Mo.—2

ception that it did not apply to or cover property situated at certain packing house plants operated by the assured, including the packing house plant operated by respondent at Kansas City, Kansas. It contained the following specific provisions:

"It is understood and agreed that this policy covers Wilson & Co., Inc., Wilson & Co., Wilson & Co. Inc. of Oklahoma, as is now or may be hereafter constituted, for account of whom it may concern, including whatever interests the said companies have or may have in property in the several corporations in which the said companies have an interest or own shares of stock, and the interests of the said several corporations in or on the premises. $2,250,000. On buildings, stock, materials and supplies, hogs, cattle, sheep and poultry, the property of the assured, or held by them in trust or on commission or on consignment or sold but not delivered or for which they may be liable, horses, mules, including all other property not specifically mentioned herein wherever located or to be located in the United States of America, except as hereinafter provided.

"It is understood and agreed that the limit of liability under this insurance shall be $100,000 in any one block bounded by four public streets, by any one fire.

"It is understood and agreed that this insurance does not apply to or cover property described above while contained in or on assured's packing house plants, situated at the following locations: Kansas City, Kansas; Oklahoma City, Oklahoma; Long Island City, N. Y.

"It is also specifically understood and agreed that this insurance shall be considered as surplus insurance where any specific insurance exists on any of the property hereby insured, and this insurance shall not apply or contribute until the amount collectible from all such specific insurance shall have been exhausted; it being understood and agreed that under this policy the assured is to be reimbursed to the extent of the difference between the amount collectible from such specific insurance

and the amount of the actual loss sustained by the assured, not exceeding, however, the amount insured or in any event the limit of loss as above stipulated."

And the following:

"This company shall not be liable under this policy for a greater proportion of any loss on the described property or for loss by and expense of removal from premises endangered by fire than the amount hereby insured shall bear to the whole insurance, whether valid or not, or by solvent or insolvent insurers covering such property, and the extent of the application of the insurance under this policy, or the contribution to be made by this company in case of loss, may be provided for by agreement or condition written hereon or attached or appended hereto.

"If fire occurs, the insured shall give immediate notice of any loss thereby in writing to this company, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, make a complete inventory of the same, stating the quantity and cost of each article, and the amount claimed thereon."

The term Kansas City Live Stock Exchange as descriptive of the assured was used in the policy of appellant for convenience merely.

Wilson & Company and the other owners of live stock at the stockyards, paid to the Kansas City Stockyards Company (not the Kansas City Live Stock Exchange) as a collecting agent for the Hartford Fire Insurance Company, a specific premium upon each car of cattle as specified in the policy belonging to it received at the yards. The other owners of live stock also paid the same specific premiums collected through the agency of the Stockyards Company. The premium paid by the owner at the time of the receipt of the cattle at the yards inured under the express provisions of the policy, to the benefit of the purchasers of the cattle at the yards as long as the stock remained there. Wilson & Company paid all

the premiums the policies specified or required on its direct shipments; and while it did not pay a specific premium upon the cattle it purchased at the stockyards from other owners who had paid this premium, by the terms of the policy this insurance inured to its benefit as a purchaser as long as the live stock remained in the specific locations described in the policies.

The fire in question started about two-thirty o'clock on the morning of October 16, 1917, in the northeast section of the Missouri or native side of the stockyards. It traveled in a southwesterly direction and finally was gotten under control about four-thirty or five o'clock.

The respondent's cattle and calves, not destroyed by fire, became a part of the twenty thousand odd head of mixed cattle and calves gathered and sold as salvage by the appellant.

The cattle and calves belonging to respondent, yarded on the quarantine side west of the Kaw river, were not destroyed by fire, as no destructive fire occurred west of that river. There is, therefore, no controversy as to whether these cattle and calves became a part of the mixed cattle and calves salvaged by the appellant.

T. G. McCroskey, appellant's live stock agent, who had charge of settling the loss and salvaging the cattle, testified on behalf of the Hartford Fire Insurance Company that he took possession of and sold at public sale all of the mixed and intermingled cattle. The number was about 20,000, including everything denominated cattle. All of the released or mixed cattle and calves were recovered and sold by appellant for $1,030,185.50.

Charles H. Hill, head cattle buyer for Wilson & Company, testified that at the request of McCroskey he took charge of the burned or injured cattle; that McCroskey was in charge of the salvaging of the cattle and calves for the Hartford Insurance Company; that he took McCroskey down to the yards early in the morning on which the fire occurred—in fact, he called McCroskey and first advised him of the fact that the yards were on fire. Dur-

ing the day following, McCroskey came to the witness and told him there were a great number of cattle badly burned but still able to walk, and asked him "to take charge of them and get them killed for him." McCroskey stated to him at this time that he was very busy with other affairs and "they were going to gather up, and were gathering up, the other cattle that were not burned and were sorting and shaping and getting them ready for sale—they were going to take the cattle up and sell them, and take charge of all the yard cattle and classify and sell them and pay all claims."

Arthur S. Henn, at the time of the fire employed as calf buyer for Wilson & Company, at the Kansas City stockyards, testified that he heard a conversation between McCroskey and Hill, after the fire, with reference to the salvage of cattle and calves. This conversation occurred at Hill's office in the stockyards. The witness stated that McCroskey told Hill that the Hartford Fire Insurance Company was to take over all cattle and pay all losses. The witness further testified that McCroskey referred to the taking over of all the mixed cattle that could walk or be killed for salvage, and McCroskey stated that the Hartford Fire Insurance Company was going to appoint commission firms to sell the cattle, and that this was done later.

McCroskey, the appellant's agent, testified on cross-examination with reference to the method of adjustment, as follows:

"Q.   In other words you were endeavoring to act in conformity with the terms and requirements of the policy in suit, is that it? A.   Well, the fact of the business was, the policy doesn't specifically recite just how these adjustments were to be made."

The evidence shows that the policy requirements were not complied with or followed by the appellant. Adjustment was not made with the president of the Exchange, nor was the draft in settlement made payable to him.

R. P. Woodbury, the secretary of the Exchange, testified that the Exchange was a voluntary organization, composed of some three hundred and more individual members, at that time, which had no interest in any of the live stock, and that after the fire, as an Exchange, it did nothing with reference to the adjustment of the loss, but the matter was entirely handled by McCroskey, as manager of the Hartford Fire Insurance Company. The latter requested that the directors of the Exchange appoint an appraisal committee. This committee was not composed entirely of members of the Kansas City Live Stock Exchange, but consisted of L. A. Lennon, the president of the Live Stock Exchange, as chairman, and Robert H. Lewis and E. M. Houx, members of the Live Stock Exchange, and Reese and Stewart, members of the Traders Exchange, an organization of traders engaged in business at the stockyards. Woodbury, as secretary, testified that the Kansas City Live Stock Exchange did not have anything to do with gathering up the cattle or salvaging them; that this was done by McCroskey, representing the Hartford Fire Insurance Company, and the Exchange had no record as to the cattle salvaged or as to what they brought at the sale.

A statement of the cattle and calves lost by Wilson & Company was presented to this appraisal committee first by Charles H. Hill. This was after he had assisted McCroskey and the Hartford Fire Insurance Company in salvaging the burned or injured cattle and had been told by McCroskey that all claims would be paid and all mixed cattle taken over by the Hartford Fire Insurance Company and sold for its account.

When this claim was presented to the committee, Hill was asked whether Wilson & Company had other insurance. He told them that he did not know, but would refer the matter to Chicago. About ten days or two weeks after the fire William R. Brown, counsel for respondent and who had under his direct supervision insurance matters for the respondent, came to Kansas City

from Chicago and presented to the committee the proof of loss, showing the number of head of cattle and calves lost by mixing at the time of the fire. He also brought with him a copy of the floater's policy issued by Globe & Rutgers Fire Insurance Company on property of Wilson & Company and its subsidiaries, and discussed the matter of other insurance with R. H. West, general live stock agent for the Hartford Fire Insurance Company, before it was presented to the committee. Brown informed the committee that Wilson & Company had no other specific insurance on the live stock lost; that they had a floater's policy which he had with him and offered to show them.

Robert H. Lewis, one of the members of the committee, testified that this policy was shown and handed by Brown to L. A. Lennon, the chairman of the committee. West, the live stock agent for the Hartford Fire Insurance Company, who was present at this meeting, denied that Brown had any policy with him. Both Brown and Lewis testified that Brown described this policy as a floater's policy and requested that the claim be held by the committee until the question of whether or not the other policy was applicable to the loss and could be settled. Robert H. Lewis's testimony on this subject is as follows:

"We decided that Brown should not leave it, as we did not know whether it, in any way, would conflict with our contract, and we asked him to take his claim with him, and he did. West was in the room at the time. . . . Lennon asked the question, if they had any other insurance—'any other specific insurance' were the words he used; and Wilson answered that they did not have any specific insurance, but they had a floater's policy, and that he had it, and handed it to Lennon, designating it as a 'floater's policy.' Lennon then stated that, under the contract, in case of specific insurance, the other insurance should be absorbed first; that it wasn't clear to him whether this floater policy would conflict with

the Live Stock Exchange policy, and he asked that they take it up with the Hartford Insurance Company, and straighten out that point. These are about the words he used—'That if the Hartford and Wilson companies decided that Wilson's floater policy didn't conflict with our contract, we would be glad to handle the claim'— that's about his words as near as I can tell them.'' Neither West nor McCroskey, for the Hartford Fire Insurance Company, who were present, made any objection to this course of procedure.

West testified that Brown told the committee, ''Well, gentlemen, I will leave this proof with you.'' That Lewis picked up the proof and handed it back to Brown and said: ''No, don't leave it with us; there is a legal question involved, and we don't want to involve ourselves with the question of other insurance.'' That Lennon said: ''Mr. West: Brown wants to know what to do with this claim.'' And West replied: ''If there is a legal question involved, I think Brown should take it up with our attorneys in Chicago—he tells me he lives in Chicago, he can easily take the matter up with them.'' West also testified that the clause in the policy sued on protecting the assured against loss by mixing was put in all live stock policies issued by the Hartford on stockyard business and that ''it is a principal selling point of the contract.''

Brown stated that on Monday morning after the hearing before the committee, he took up the matter of Wilson & Company's claim with the general agent of the Hartford Fire Insurance Company, at Chicago, West being present. He was referred immediately to the attorneys for the Hartford Fire Insurance Company: Barger and Hicks. After several conferences with Hicks, in which liability on the part of the appellant was denied solely on the ground that the Globe & Rutgers policy applied to the loss, Hicks wrote Brown a letter, dated December 11, 1917, incorporating the following as a reason for non-payment of the claim: ''In view of the fact that Wilson & Company admittedly had insurance in

the Globe & Rutgers Fire Insurance Company covering the live stock destroyed by this fire for a sufficient amount to pay the loss, and the further fact that the policy issued by the Hartford Fire Insurance Company to the Kansas City Live Stock Exchange et al., provides that it should not attach nor the Hartford Fire Insurance Company become liable for loss to property wherein the owners thereof had insurance of other companies, I am obliged to advise my client that it is not liable to Wilson & Company for any loss sustained by the latter on account of this fire.''

Subsequently, March 28, 1918, R. M. Bissel, president of appellant company, wrote a letter to the vice-president of Wilson & Company, declining payment of the claim on the sole ground that the Globe & Rutgers Fire Insurance Company's policy constituted specific insurance. He also assumed in this letter as a fact, shown under the evidence to have been incorrect, that the committee of the Exchange had rejected the Wilson & Company claim.

West testified that a week after Brown appeared before the committee of the Exchange, the loss was adjusted with the Kansas City Live Stock Exchange, and on the 15th of November, 1917, he drew a draft on the company for $1,733,779.99, payable to the Kansas City Live Stock Exchange, in settlement of the claims passed upon and approved by the committee. This draft on its face contained the statement that it was in full payment of all claims.

At the time this draft was made, a written document was also executed, which contained the statement that: ''It is further understood and agreed that if any legitimate claim for loss under said policies should be presented to the Kansas City Live Stock Exchange, supported by the required proof and within the time provided by the terms of said policies, not included in or covered by this settlement, said claim will be considered on its merits and if found by the committee from the

Exchange and the Hartford Fire Insurance Company to be legitimate and a proven claim for which the Hartford Fire Insurance Company would be liable, a further allowance and payment in addition to the amount for which receipt and release is given, will be made by the Hartford Fire Insurance Company in an amount to cover such claim.''

Of the disbursements made by the Exchange out of the amount received by it through this payment by the appellant, Wilson & Company received nothing in payment of its loss. However, the sum of $1,500 was paid to McCroskey, the agent of the appellant fire insurance company, and $10,631.20 to the Kansas City Stockyards Company for feeding the stock salvaged by the appellant before the sale occurred.

McCroskey testified that the Hartford Fire Insurance Company did not intend in this payment and by giving this draft to pay anything on the Wilson claim. His testimony is as follows:

''Q. Now, did this check that was sent here by the Hartford Fire Insurance Company, when you delivered it, did you understand that covered anything for Wilson, or did it take the Wilson claim out of it entirely? A. It didn't cover Wilson's.

''Q. So the Hartford Fire Insurance Company did not intend by that check to pay anything on the Wilson claim at all? A. Oh, no.''

The Wilson & Company claim was then in controversy between the general attorneys for Wilson & Company, Brown and his associates, and the attorneys for appellant, Barger and Hicks. Thereafter, the matter was taken up with R. M. Bissell, president of the appellant company, resulting in his writing the letter above referred to.

Bissell testified that he had a conference with Cowan, vice-president of the respondent, and that the difference between them as to the payment of the insurance was because Wilson & Company had insurance under their

own name; that the entire subject of discussion was whether or not the Globe & Rutgers policy was specific; that he did not think the fact that the Hartford Fire Insurance Company took possession of the Wilson & Company cattle after they were mixed with those of other owners, sold them and took the proceeds, and has ever since retained the same, affected the claim at all. His testimony in that regard is as follows:

"Q. Now, Mr. Bissel, if Wilson & Company's cattle were lost there by mixing and not by fire, and you had got the cattle or gathered any part of them, is it your contention that you would still not be liable under your policy? A. My answer would be that in that case our policy would have nothing to do with the issue at all, that the possession or non-possession of the cattle belonging to Wilson & Company would not affect our liability under the contract.

"Q. And it doesn't affect it now in this claim at Jackson County, Missouri? A. Not under the contract."

He also stated that he had not previously been informed that McCroskey, acting for the Hartford Fire Insurance Company, had sold the salvaged cattle. He stated further: "I supposed that the Live Stock Exchange and the Stockyards Company, and others, for that matter, had gathered them up in the way things of that kind are usually done after a catastrophe."

With reference to the question as to whether or not the Hartford policy constituted specific insurance within the meaning of the language contained in the Globe & Rutgers insurance policy, he testified as follows:

"Q. Your policy expressly provided, did it not, that it shall be considered that every shipper shall be covered by that just the same as if his name had been written in the policy? A. It is an indorsement put on the policy a year after the policy was written. That indorsement provides that this insurance shall cover and be for the benefit of all owners or persons interested. It is understood and agreed that this policy is written in

.the name of the Kansas City Live Stock Exchange for convenience, but shall inure to the benefit of all persons owning or interested in said live stock as their interests may appear, and shall have the same binding force as if their names were written therein.

"Q. If the names of the parties had been inserted therein, you would consider that specific insurance, wouldn't you? A. If Wilson's name had been written in that policy, then that would be specific insurance."

The respondent first brought suit to recover for the loss on October 14, 1918, in New York City. This suit stated that the cattle and calves lost had been purchased by it through, the Kansas City Live Stock Exchange or members thereof, and at the time of the fire still remained "in the possession of and under the control of said Kansas City Live Stock Exchange." No allegations appeared in the petition with reference to whether or not the loss had been paid to the Kansas City Live Stock Exchange or to the president thereof, as required by the policy. No allegations were made showing the presentment of the claim to the Exchange or the refusal of the president to act with reference to the adjustment or enforcement of same. A nonsuit was entered in that proceeding. This, under the New York practice (Sec. 1209, N. Y. Code of Civil Procedure) was in the form of a judgment dismissing the complaint pursuant to the opinion of the Appellate Division, Supreme Court of New York, First Department. [190 N. Y. Sup. Ct. Rep. (App. Div.) 506.]

Appellant urged objection to the admission of evidence relating to proof of the value of the cattle on a basis of the cost price by group. It was agreed, as hereinafter pointed out, that the cost price should be representative of the reasonable market value. Appellant, however, takes the position that the cost price of a number of cattle where these cattle were purchased as a bunch or drove, does not establish the value of the individual members of the drove as being within the policy limits

of $150 as applied to cattle, and $50 as applied to calves. The evidence disclosed that in the adjustment of all other claims, except that of respondent, the appellant adopted the method of establishing value by group or lot where cattle were bought and held by the claimant in that manner. In the application of appellant's contention the owners of the 32,000 odd head of cattle lost or intermingled by the fire would be required to weigh separately each animal to ascertain its proper value. This was, of course, impossible after the fire occurred.

Robert H. Lewis, a member of the appraisal and adjustment committee, testified that the cattle and calves, in making the adjustment or appraisement, were all valued by lots or bunches, where they were sold or held for sale in that manner, and that no objection was made to this method of valuation by the appellant. Charles H. Hill testified that cattle purchased by packers, such as the cattle and calves for which suit is brought by the respondent, were bought in bunches or droves of like character, quality and weight. The cattle are classified before they are offered for sale and are divided into bunches of like quality and weight, and being bought at the same price per pound, are to be regarded as of approximately the same value per head.

The evidence further discloses that while the total amount of coverage under the policy limits on the 1,434 head of cattle and calves lost by Wilson & Company, amounted to $143,000, the recovery was for less than one-half that amount. It was, therefore, well within the policy limits.

Two stipulations were entered into during the course of the trial with reference to the introduction of evidence. First, it was agreed that proof of the amounts paid for cattle by the respondent on the day preceding the fire should stand as representative of the market value of the cattle, and that no testimony would be necessary to establish that the amounts so paid constituted a reasonable market value; second, it was stipulated and agreed

that the Supreme Court of New York, in which the judgment of dismissal in the suit of Wilson & Company v. Hartford Fire Insurance Company, supra, was rendered, was a court of general jurisdiction, and it was further agreed and stipulated that any and all New York authorities or cases either party cared to cite, should be considered as in evidence as if actually inserted in the record.

I.  Preliminary to a consideration of the merits, the effect of the dismissal of the suit brought by the respondent in New York City against the appellant demands attention.  It is contended by the appellant that this suit constituted a final adjudication of the merits of the case at bar, and, hence, its plea of *res adjudicata* should have been sustained.

Res Adjudicata.

The dismissal of the New York City case was entered upon a motion for a judgment on the pleadings under Section 547, New York Code of Civil Procedure, which provides that: "If either party is entitled to a judgment upon the pleadings, the court may upon motion, at any time after issue joined, give judgment accordingly."

This general provision is limited by Section 1209 of the New York Code of Civil Procedure, the provisions of which are as follows:

"A final judgment dismissing the complaint, either before or after a trial, rendered in an action hereinafter commenced, does not prevent a new action for the same cause of action, unless it expressly declares, or it appears by the judgment roll, that it was rendered upon the merits."

The opinion in the New York City case, supra, stated that the contract of insurance was made between the defendant and the Kansas City Live Stock Exchange, in consideration of premiums to be paid by the latter.  As shown by the pleadings and evidence, in the case at bar, this was not the fact; the various owners paid the premiums in accordance with the terms of the policy as cattle

belonging to them which had been entered in the stock-yards in question.

There were no allegations with reference to the Kansas City Live Stock Exchange as a voluntary organization composed of many hundreds of members, and no denial was made that the Exchange had any interest in the live stock lost. *Inter alia,* the opinion stated, at page 512 of 190 App. Div. N. Y.: "It would only be in the case of the refusal of the president to adjust the loss, or having collected, to fail to pay over, that a right of action might arise in the plaintiff. There are no facts stated in this complaint that tend to support such a cause of action. It is alleged that the proofs of loss were presented by the Exchange and that it performed all the terms and conditions of the policy. It does not state whether the defendant paid the president of the Exchange, or refused payment. It does not allege any demand made upon the Exchange, or its president, either for payment or that it bring an action. If plaintiff has any right of action it would be one in equity in which the Exchange and possibly the president would be necessary parties.

"The order should be reversed with ten dollars costs and disbursements, and defendant's motion granted and the judgment entered dismissing the complaint, with costs."

This judgment, under the New York Procedure, is limited in its effect to that of a ruling on a demurrer or nonsuit, as it contains no express statement as the statute (Sec. 1209, supra) requires that it is "upon the merits."

In short, the opinion in the New York Supreme Court case, supra, in directing the rendition of the judgment does not declare that it was rendered upon the merits, but has express reference to a new proceeding upon the same cause of action and states in passing what, in its opinion, under the facts before it, which were not the facts pleaded in the case at bar, should be the character of such new proceeding. The New York Court of Ap-

peals in Genet v. Canal Co., 170 N. Y. 278, in ruling upon the question as to the effect upon subsequent proceedings of a judgment roll of the character offered in evidence by the appellant, has held that the same is not admissible in evidence either to support a plea of *res adjudicata,* or as an estoppel. The language of the court, at page 279, being as follows: "The court erred in admitting in evidence the judgment roll in the former action between these parties entered on a dismissal of the complaint ordered by this court on appeal and reported in 122 N. Y. 505, inasmuch as it is not expressly declared in the judgment that it was rendered upon the merits and it does not so appear in the judgment roll. It is not sufficient for a party who sets up a prior judgment as a bar or seeks to introduce it as conclusive evidence, to produce a record showing a judicial determination in his favor of the question in litigation. He must further show, and by the judgment roll, that the judgment was rendered upon the merits and cause it to appear that the question was a material point in the former action. [Citing Webb v. Buckelew, 82 N. Y. 555; Revere Copper Co. v. Dimock, 90 N. Y. 33; Springer v. Bien, 128 N. Y. 99-102; Shaw v. Broadbent, 129 N. Y. 114; Rose v. Hawley, 141 N. Y. 375; Converse v. Sickles, 146 N. Y. 200-208; Genet v. D. & H. C. Co., 163 N. Y. 173.]"

Quoting with approval the Genet Case, last above cited, the court said: "And although a decree in express terms professes to confirm a particular fact, yet if the stated facts were immaterial to the issue and the controversy did not turn upon it, the decree will not conclude the parties in reference to such facts."

In considering the effect of the judgment roll in further approval of the Genet Case, supra, the court held: "It is a sufficient answer to the appellant's claim to say that neither the judgment of this court nor the order and judgment entered thereon in the court below dimissed the complaint on the merits."

After quoting Section 1209 of the New York Code of Civil Procedure, the court further held: "As this

judgment would not have been conclusive between the parties in a new suit brought for the same cause of action, *a fortiori,* it cannot be conclusive in litigation as to other causes of action.''

In Converse v. Sickles, 146 N. Y. 1. c. 207, under a state of facts similar in material matters to that at bar, the Court of Appeals in ruling upon the application of the defenses of estoppel and *res adjudicata* said: ''There was no trial or adjudication upon the merits. There is no mention of the merits in the judgments entered. The only expression that appears having any bearing upon that subject is the recital that the jury had duly rendered a verdict in favor of the defendant. This does not conclude the parties. Under the circumstances it is in effect nothing more than a nonsuit. The questions of estoppel, *res adjudicata* or bar, cannot be disposed of from the judgment alone. These questions have to be determined from the judgment roll, composed of the pleadings, the clerk's minutes of the trial and the judgment. The pleadings disclose the subject-matter in litigation and the issues formed, the minutes of the clerk, the proceedings had upon the trial, the judgment and the award made thereon. A knowledge of the subject-matter, issues formed, proceedings had and determination made, is essential in order to determine whether a party has had a day in court with a hearing as to the merits of his controversy. There are many cases in which close distinctions have been made upon the subject of *res adjudicata* as applied to second suits, but in support of our views we deem it unnecessary to here refer to more than the general principls recognized by the cases.''

In re Durand, 107 N. Y. Supp. 1. c. 396, is another case in point. In that case one William H. Morgan brought a suit for an accounting against the trustee under the will of his father. The defendants claimed that the plaintiff was barred from trying the issues because of a judgment of the Supreme Court in another action in which Morgan was plaintiff and the trustee was de-

fendant, wherein the same question was in controversy and the plaintiff's complaint in the first action was dismissed on motion. The court in passing upon the effect of the former judgment as a bar to the second suit, said: "Their claim is that said judgment is conclusive and *res judicata* against those claiming herein against the University of Rochester." The court then sets out the judgment in the first suit, dismissing the case upon the motion of the defendant, and proceeds, at page 396: "I am of the opinion that said judgment is not a bar or *res judicata* against the contestant William H. Morgan, as administrator of Lemuel S. Morgan, deceased, nor against Harriet Porter, as executrix of the last will and testament of Mary E. Morgan, deceased. [Genet v. Delaware & Hudson Canal Co., 163 N. Y. 173, 57 N. E. 297.]" To a like effect are Thorn v. DeBreteuil, 83 N. Y. Supp. l. c. 855; Rudd v. Cornell, 171 N. Y. 114, 63 N. E. 823; Reynolds v. Ins. Co., 160 N. Y. 635-651, 55 N. E. 305.

From the foregoing it appears that under the New York Code of Civil Procedure and the decisions of that State appellant's contention is without merit that the dismissal of the action in New York upon order of the court constituted an adjudication of the issues or operated as an estoppel as to matters therein referred to. The judgment rendered, therefore, in New York does not have the force and effect appellant claims for it, and the authorities cited in its brief do not, when correctly construed, so hold. No greater force or effect will be given to that ruling in this State than where it was rendered.

As exemplifying this conclusion, apart from the New York statutory limitation and the judicial rulings thereon, the courts of Missouri and elsewhere hold that a judgment on demurrer will not sustain a plea of *res adjudicata* to a petition in which the essential allegations lacking in the former complaint are supplied.

In Johnson v. United Railways, 243 Mo. 278, l. c. 294, cited by appellant, WOODSON, J., said: "The fore-

going cases, as well as many more throughout this country and England, in substance hold that where the demurrer strikes at the merits of a cause, the very life of it, and not to some collateral question arising during the progress of the trial, or to some matter in abatement, such as non-joinder or misjoinder of parties, multifariousness, improper joinder of actions, etc., the judgment thereon is final. We do not wish to be understood as holding that where the petition shows upon its face that the plaintiff has a good cause of action but the merits thereof are so carelessly, imperfectly or defectively stated as not to constitute a cause of action, the sustaining of a demurrer thereto would constitute *res adjudicata.*"

The decision of this court in Wells v. Moore, 49 Mo. 229, l. c. 230, is also applicable, wherein the court states: "It is a well established principle that where a matter has been once adjudicated on its merits, in a suit between the same parties or their privies, such adjudication is a complete bar to another action. But the principle is equally well settled that where the former adjudication was not on the merits, it forms no bar to another action. The merits of the case were not touched by the first judgment. The court did not pretend to decide anything except that the plaintiff's petition was defective. Whether that consideration was right or wrong, it is unnecessary now to inquire. It is sufficient to say that such an adjudication is no bar to another action between these parties. [Bell v. Hoagland, 15 Mo. 360, and other cases.]"

In Swing v. Furniture Co., 150 Mo. App. 574, three petitions had been adjudged insufficient, and the court entered a judgment directing the plaintiff to take nothing by his suit and the defendant to go hence without day, recover treble costs and have execution therefor. The plaintiff appealed on the ground that the form of the judgment made it final and was therefore in error. Upon a reversal and remanding of the case, the court

said, at page 582: ''The judgment entered in the present instance purports to be final in that it directs that the plaintiff take nothing by his suit and that the defendant go hence without day, recover treble costs and have execution therefor. The principle is well established that where a matter has once been finally adjudicated, the parties to the action are for all time precluded from raising that question again. But it is equally as well settled that such final adjudication, in order to be a bar, must have been on the merits. In other words, a judgment on demurrer is not a bar to a subsequent suit between the same parties touching the same cause of action. [Wells v. Moore, 49 Mo. 229; Freeman on Judgments (4 Ed.) sec. 260; Bennett v. Southern Bank, 61 Mo. App. 297.] The statute above referred to authorizes the court upon sustaining the third demurrer to do no more than enter the usual judgment on demurrer, give judgment for the penalty of treble costs and dismiss the petition, thus leaving the plaintiff free to institute a new suit if he chooses to do so. [Gordon v. Burris, 125 Mo. 39, 28 S. W. 191; Bennett v. Southern Bank, 61 Mo. App. 297.]''

In Murphy v. Creath, 26 Mo. App. l. c. 586, the law upon this subject is summarized as follows: ''The great weight of authority in the United States at this day, unquestionably is, that a dismissal of a suit will not operate as a bar to a new action, unless it distinctly appears that the entry of dismissal was either made by the court, upon an examination of the merits, or that it was the result of a complete settlement between the parties themselves of the matters in controversy between them, and in either event such facts must be shown *aliunde* the record entry itself. [Cromwell v. County of Sac, 94 U. S. 351; Chase Case, 1 Bland Chy. 206; Taylor v. Larkin, 12 Mo. 103; Bell v. Hoagland, 15 Mo. 363; Clemens v. Murphy, 40 Mo. 121; Wright v. Salisbury, 46 Mo. 26; Spradling v. Conway, 51 Mo. l. c. 54.]''

Judgments held not to be a bar to another action because not rendered on the merits, after an exhaustive re-

view of the cases by leading text-writers, are classified as follows:

1.   Where the plaintiff fails for want of jurisdiction in the court to hear his complaint or grant his relief.

2.   Where he has misconceived his action.

3.   Where he has not brought the proper parties before the court.

4.   Where the decision was on demurrer and the complaint in the second suit sets forth the cause of action in proper form.

5.   Where the first suit was improperly brought.

6.   Where the matter in the first suit is ruled out as inadmissible under the pleadings. [Smith's Leading Cases, 673; 1 Freeman, Judgments (4 Ed.) sec. 263, p. 479 and cases cited.]

The judgment in the New York case falls fairly within at least three of these classifications; and in harmony with our own cases and those of the New York courts, we rule this contention against the appellant.

II.   Respondent's right to sue in its own name is questioned.   This contention is based on the assumption that the contract makes the president of the Kansas City Live Stock Exchange, as well as the Exchange, active trustees of an express trust and as such vested with the legal title to any cause of action which may arise by reason of a breach by the appellant of its obligation.

**Proper Plaintiff: Trustee of Express Trust.**

Section 1155, Revised Statutes 1919, provides, among other things, that an action shall be prosecuted in the name of the real party in interest except as provided in the succeeding section.   This section (1156) excepts an executor or administrator, a trustee of an express trust, or a person expressly authorized by statute to sue in his own name without joining with him the person for whose benefit the suit is prosecuted.   A trustee of an express trust, within the meaning of this section, is construed as

including a person with whom or in whose name a contract is made for another. The potential effect of this definition is contended not only to be permissive but preclusive in that it limits the right of action to the trustee alone, or, conversely, that the one for whose benefit the contract is made cannot sue thereon in his own name.

Although this contention to the impartial mind may be deemed a web of gossamer, so far as it constitutes a substantial defense to this action, having been seriously made, it must be so considered. *Imprimis,* whatever effective force it may have had if it had been presented in a timely manner has been waived by the appellant. The vice complained of appeared in the petition. Not only did the latter contain all the material provisions of the policy which constitutes the contract, including the clause that "loss under this policy shall be adjusted and payable to C. T. McCoun, president or his successor in office for the use and benefit of the owners of property injured or destroyed," but it also set forth all of the facts concerning the refusal of the appellant to permit the adjustment of the loss and a denial of liability on the ground of the existence of Globe & Rutgers insurance policy held by the appellant. The alleged defect being thus rendered apparent could be effectively challenged only by a demurrer.

Failing so to do, the pleading of same in the answer and assigning it as error here avails nothing.

It is scarcely necessary to add that the statute (Sec. 1226, R. S. 1919) which requires a defect of parties to be assailed by demurrer is imperative. Supplemental thereto, it is provided in a subsequent section (1230) that if the defect if not thus questioned, where the facts are as at bar, it will be waived. These statutes, in the words in which they now appear, have been a part of our code since the revision of 1855. Numerous rulings thereon have sustained their affirmative application where it has been sought to interpose the defense of a defect of parties. For example in Johnson v. United Rys., 247 Mo. 1.

c. 357, it is said: "If there be a defect in parties plaintiff or defendant appearing in a bill, it should be struck at by demurrer. Answering over, as here, waives it once for all." [Citing cases, p. 358.] To a like effect are the rulings of the court in the later cases of Jackson v. Johnson, 248 Mo. l. c. 692; Wolz v. Venard, 253 Mo. l. c. 84; Crowl v. Am. Oil Co., 255 Mo. l. c. 327; Sidwell v. Kaster, 289 Mo. l. c. 186.

In the presence of the statutes cited, buttressed by the rulings of this court thereon, no other conclusion is tenable than that the appellant is precluded from now urging respondent's incapacity to sue on this contract.

However, learned counsel in a labored argument insistently assail the respondent's right to sue. Despite appellant's waiver, therefore, a discussion of the merits of this question will, if no more, make manifest a purpose to fully consider upon their merits all serious assignments of error.

There is no gainsaying the fact that our statute, above cited (Secs. 1156, supra), defines the party in whose name a contract is made for the benefit of another as a trustee of an express trust and as such that he may sue in his own name. This right of action, however, is not to be construed as exclusive and as such to preclude the beneficiary from maintaining an action on the contract in his own name. The statutory provision (Sec. 1155, supra) that every action shall be prosecuted in the name of the real party in interest is clearly, in its general terms, inclusive of the beneficiary. It is only under an express exception to this general rule that the trustee of an express trust is authorized to sue. The power granted to the trustee being under an exception, it cannot and should not, under any reasonable rule of construction, be held, in the absence of an express statute, to neutralize or nullify the exercise of the general power. Such a course, as we will presently show, was never contemplated by the framers of the permissive statute. Whether this rule of practice is deducible from the com-

mon law or is the creature of American State legislation is immaterial in determining the extent of its application. From its context, we are authorized in concluding that its purpose was to simplify litigation and to effect the same result in one action that two would otherwise be required to accomplish. To hold, therefore, that the right of action upon a contract under this statute was limited to the one in whose name it had been made for the benefit of another to the exclusion of the right of such other to sue thereon would defeat the prime purpose of the statute. Instead of simplifying, it would render the procedure more complex, and as a consequence the administration of the law more difficult.

The power granted being permissive, either the trustee or the beneficiary or both may sue. We recently so held in Trust Co. v. Tindle, 272 Mo. l. c. 693, in which we said that the trust company, being the trustee of an express trust, was authorized to sue in its own name, but that this did not preclude it from joining the bank therewith as a party plaintiff as one having an interest in the subject of the action. Many cases, not necessary to be cited on account of the uniform application of the rule, approve this procedure.

Under the policy of insurance, the relation created between the respondent and the appellant was contractual, the president of the Exchange and the Exchange itself being named therein solely for convenience. Losses incurred, while nominally payable to the president, were for the benefit of the respondent. The right of the latter to sue in the event of loss, with or without joining either the president or the Exchange, therefore, although the respondent was not named in the contract, is within the power conferred by the statute. We so held in St. Louis v. Wright Con. Co., 202 Mo. l. c. 460; St. Louis to use v. Von Phul, 133 Mo. l. c. 565; Ellis v. Harrison, 104 Mo. 276. The ruling in these cases is to this effect; that ''a contract made between two parties, based upon a valid consideration, may be enforced by third par-

ties when entered into for their benefit and that is true though such parties are not named in the contract."

On the, merits we hold that the respondent was the real party in interest and authorized to institute this action.

III.   It is contended that the amount paid by the appellant to the Kansas City Live Stock Exchange in satisfaction of the losses of others which had been adjusted, released the appellant from liability to the respondent under the policies. The claims paid by the appellant were on losses of others than the respondent, which had been ascertained and adjusted by the committee of the Exchange. The conclusion sought to be deduced from this contention is that the payment by a debtor of one or many liquidated claims will constitute a sufficient consideration to require the creditor to release a similar claim supported by a, like consideration whether such claim be liquidated or unliquidated.  One of our courts of appeals in Siewing v. Tacke, 112 Mo. App. l. c. 418, mildly makes merry over this character of defense and in that vein denominates the debtor's plea as "unique." However much this pleasantry may tend to encourage that sunshine of the human countenance we call a, smile, the force of the plea must be determined from the facts.

At the time this payment was made a written agreement was entered into between the appellant and the Kansas City Live Stock Exchange.  By its terms the Exchange, as the agent of the appellant, agreed upon the payment by the latter to it of adjusted claims, to make settlement of same with the owners and obtain releases and receipts from them for the appellant.  Respondent's claim was not adjusted. It was therefore not within the terms of the agreement.  That nothing has been paid or was intended to be paid on this claim is shown by the testimony of McCroskey, appellant's agent, who represented it in the adjustment of these claims. It was as follows:

"Q. Now, did this check that was sent here by the Hartford Fire Insurance Company, when you delivered it, did you understand that covered anything for Wilson, or did it take the Wilson claim out of it entirely? A. It didn't cover Wilson's.

"Q. So the Hartford Fire Insurance Company did not intend by that check to pay anything on the Wilson claim at all? A. Oh, no."

All the cogent facts therefore point to this conclusion that by its agreement appellant only intended to pay those whose claims had been adjusted, that only such were paid and that the draft evidencing these payments, whatever its terms may be, cannot be construed to release the appellant from its liability to the respondent. Relevant to this conclusion is the case of Rogers v. Foundry Co., 167 Mo. App. l. c. 251, in which it is said: "That check represented the exact amount of defendant's indebtedness on other matters not connected with the matters involved in this suit, and such indebtedness was liquidated, due and undisputed. There must be a consideration to support an accord and satisfaction (Scott v. Parkview R. & I. Co., 145 S. W. (Mo.) 48).; and the payment of a debt clearly due does not constitute a sufficient consideration to support any kind of a contract or agreement. [Swaggers v. Hancock, 25 Mo. App. 596.] There was no compromise because there was nothing conceded by the defendant. [Scott v. Parkway, R. & I. Co., supra.] Nor do we believe the tender of the $1,258.13 due on the other matters was made in a manner or under such circumstancs that any reasonable mind could understand it to apply on the matter here involved. On the contrary the reference is inevitable and conclusive that the defendant intended nothing more than to pay its conceded indebtedness."

And in the case of Copeland v. Insurance Co., 6 Pick. (Mass.) 198, l. c. 205, the Supreme Court of that State said: "He (Bright) might well prohibit the plaintiff from maintaining the suit for his proportion of the

loss; but the policy was in the name of the plaintiff. The action is brought by him for the benefit of himself and the other owners and it would be manifestly unjust that one owner having received payment for his part of the loss, having compromised with the underwriters, or being unwilling to litigate the claim, should have the power to defeat the natural rights of the others. Bright might well revoke the power which he had given to the plaintiff to prosecute for his benefit, but he could not annul the authority which the other owners had given to sue for them, much less the right which he had to maintain the action in his own name for his own benefit.''

And in an opinion *per curiam,* the court said: ''We were inclined to think the first count sufficient to sustain a judgment for three-fourths of the sum insured; that as it stated correctly the interest of all the parties for whose benefit the suit was originally brought, the revocation by Bright of the authority to prosecute any further on his behalf, ought not to be allowed to prejudice the other parties concerned.''

The futility of this contention is further demonstrated by the fact that at the time this payment of the adjusted claims was made and the release thereon executed, the respondent's claim was then in controversy between the respective counsel of the respondent and appellant. The sole question under consideration between these gentlemen was whether the Globe & Rutgers policy was specific insurance. In addition to other testimony this fact is attested by a letter written about a month after the adjusted claims had been paid by Hicks, counsel for appellant, to Brown, counsel for respondent, in which it is stated: ''In view of the fact that Wilson & Company admittedly had insurance in the Globe & Rutgers Fire Insurance Company covering the live stock destroyed by this fire for a sufficient amount to pay the loss, and the further fact that the policy issued by the Hartford Fire Insurance Company to the Kansas City Live Stock Exchange et al. provides that it shall not attach nor the Hartford Fire Insurance Company become liable for

loss to property wherein the owners thereof had insurance of other companies, I am obliged to advise my client that it is not liable to Wilson & Company for any loss sustained by the latter on account of this fire.''

Further corroborative of what constituted the matter in controversy, on March 28, 1918, R. M. Bissell, president of the appellant company, wrote a letter to G. H. Cowan vice president of the respondent company, in which he stated:

''First: It appears that you held at the time of the Kansas City Stockyards fire a policy in another company which so far as its text was concerned clearly covered any live stock which you might have at the time possessed in the Kansas City stockyards.

''Second: Our own policy distinctly provided that we should not be liable for loss in the case of owners of live stock who carried specific insurance—i. e., specific as to ownership, our own policy being specific as to location but blanket as to ownership.

''Third: There were other owners of live stock carrying fire insurance which protected their own specific interests whose position is thus closely if not exactly analogous to your own and concerning whose property the claims committee of the Live Stock Exchange took the same attitude.''

Not only the relevant but the correlative facts furnish no proof of the appellant's contention that the respondent acquiesced in this release and is thereby estopped from prosecuting its claim against the apellant. It is little in accord with the usual course of human conduct that one who has a substantial claim against another which is being pressed for settlement would acquiesce in a release given by others to his debtor when no consideration passed or was promised for such acquiescence and it was admitted by his debtor that he was not included in such settlement and that no payment was intended to be made to him. Such a contention made under the facts at bar is a mere toying with words and is wholly lacking in merit.

IV.  As limiting the appellant's defense, we are concerned with the effect of its refusal to permit the respondent to present for adjustment to the president of the Exchange respondent's claim on the ground that it had other specific insurance coupled with appellant's denial of liability on the sole ground of the existence of such alleged specific insurance.  As to the merits of this contention let the evidence make answer.  The Live Stock Exchange and its president, with the concurrence of the representatives of the appellant, refused to receive respondent's proof of loss until the question was settled as to the character of the Globe & Rutgers insurance, i. e., whether or not it was specific.  Respondent was directed to submit this question to the attorneys for the appellant in Chicago, and in the event they determined that the Globe & Rutgers policy did not constitute specific insurance, respondent was again to present its claim to the committee.  Appellant's attorneys denied all liability on the sole ground that the Globe & Rutgers policy was specific and fully covered the loss.  This denial of all liability rendered the presentation of the claim to the president of the Exchange a hollow and ineffectual formality.  Of what avail would an ascertainment of the amount due have been if the appellant, putting aside all other defenses, rested alone upon the question of the validity of respondent's claim?  Under such a state of facts the contention loses its force that a compliance with the requirement as to the presentation of the claim was a condition precedent to the respondent's right of action.  The appellant declared it did not intend to settle.  Litigation, therefore, was the respondent's *dernier resort* and the means by which the damage was to be ascertained without litigation became unnecessary and was not required to be called into action.  It has been often held, as we will presently show, that an unqualified denial of liability dispenses with the requirement here insisted upon and that action will be allowed without a compliance with the same.

*Presentation of Claim.*

In Thomas v. Ins. Co., 78 Mo. App. l. c. 273, it is held that: "The undisputed evidence is that the company denied any liability whatever for the loss and refused to consider an adjustment of the same. A denial of all liability left nothing under the arbitration clause to be adjusted; the amount of the loss or damages is what was agreed to be arbitrated in case of a disagreement between the assured and the company, not the liability of the company. By an unqualified denial of all liability the appellant was relieved from pursuing the arbitration clause."

In Wainer v. Milford Fire Ins. Co., 153 Mass. 335, it is held that: "The assured under a policy of fire insurance (citing the statute), made a plain but informal offer to submit to arbitration the question of the amount of a loss under the policy, which did not contain the names of the persons selected by him to act as arbitrators; and the insurance company refused the offer on the ground that it was not liable. *Held*, that this was a waiver of any right it might have had to require an award of the amount of the loss as a condition precedent to the maintenance of an action against it on the policy."

In Dautel v. Ins. Co., 65 Mo. App. 44, it is held that: The only remaining point that requires consideration is whether the action was prematurely brought. The basis of this contention is that an appraisement or an effort by the assured to secure an appraisement, was a condition precedent to bringing suit on the policy. Generally speaking, this is true, where there is such a provision in the policy. [Murphy v. Mercantile Co., 61 Mo. App. 323; McNees v. Southern Ins. Co., 61 Mo. App. 335; Hooker v. Ins. Co., 69 Mo. App. 141; Hamilton v. Ins. Co., 136 U. S. 242.] But this provision, like any other contained in a contract, may be waived. It is supposed to be there for a rational purpose; namely, to ascertain in a fair and impartial way what the loss is in order that the company may settle it. If the company does not intend to settle, there is no reason why the loss should be

appraised. If litigation must be resorted to to collect, the means of ascertaining the damage without litigation need not be called into play. The law is that a denial of liability is a waiver of those requirements and an action may be brought without complying with it.

In Williams v. United States Bank, 2 Peters (U. S.) l. c. 102, it is held that: ''The principle here stated is not peculiar to this class of contracts. If a party to a contract, who is entitled to the benefit of a condition upon the performance of which his responsibility is to arise, dispense with, or by any act of his own, prevent the performance, the opposite party is excused from proving a strict compliance with the condition. Thus, if the precedent act is to be performed at a certain time or place, and a strict performance of it is prevented by the absence of the party who has a right to claim it, the law will not permit him to set up the non-performance of the condition as a bar to the responsibility which his part of the contract had imposed upon him.''

Appellant's officers, agents and attorneys admittedly prevented and rendered impossible the adjustment of this loss through the president of the Live Stock Exchange or the committee adjusting other losses. Appellant took the position that until there was a loss to adjust, neither the president nor the committee had any right to act. Having taken that position and never having permitted the situation to arise where the committee could adjust the loss, it will not be heard to interpose a defense based on a failure to comply with a provision of the contract which, by its own option, it has rendered inoperative.

V. Appellant further contends that the Globe & Rutgers policy was specific insurance; that appellant's policy constituted compound or blanket insurance and hence within the terms of the latter the appellant is released from liability.

Specific and Floating Insurance. Condition of Forfeiture.

Appellant's policy contained this clause: "It is specifically understood and agreed that if there be any specific insurance on live stock as above described, then this policy shall apply only after such specific insurance is exhausted."

In the Globe & Rutgers policy the provision defining its application is as follows:

"It is also specifically understood and agreed that this insurance shall be considered surplus insurance where any specific insurance exists on any of the property hereby insured, and this insurance shall not apply or contribute until the amount collectible from all such specific insurance shall have been exhausted; it being understood and agreed that under this policy the assured is to be reimbursed to the extent of the difference between the amount collectible from such specific insurance, and the amount of the actual loss sustained by the assured, not exceeding, however, the amount insured, or in any event the limit of loss as above stipulated."

It is conceded that these are the applicable provisions of the policies to the matter here under consideration. It is true that in the appellant's policies there was a clause declaring them void in the event of other insurance whether valid or invalid; but under a limitation incorporated in the policies it was provided that: "The extent of the application of the insurance and the contribution to be made by the company (appellant), in case of loss may be provided for by an agreement or condition written hereon or attached or appended hereto."

In conformity with this provision there was attached to the policies the limitation above quoted to this effect: that if there was other specific insurance on live stock as above described, then the appellant was only to be held liable after such specific insurance was exhausted.

Appellant admits that this provision by necessary inference waives the prohibition as to other insurance, from which it must follow that in the presence of proof of specific insurance the clause prohibiting other insur-

ance is as though it did not exist. Under these terms of the policies therefore and the facts proven and admitted, the question which seeks solution is not the validity or invalidity of the appellant's policies but the extent of their liability, provided, of course, the Globe & Rutgers policy is to be construed as in anywise affecting the obligation imposed by the appellant's policies, a question we will discuss later. From all of which it is evident that the appellant's liability considered in the light of its assumption is to be determined from the character of the insurance.

The principal tenet in the philosophy of Lavater was that the human face was a fair index to its possessor's character. With greater force and subject to a more satisfactory demonstration is the statement that the character of a contract embodied in an insurance policy may be determined from its face. As stated it is appellant's contention that the character of its policies embodies that of compound or blanket insurance. A policy of this character is one that invariably covers and attaches to every item of property described therein. If the loss of one item exhausts the whole amount of the policy the entire insurance must be paid and there can be no apportionment. Another definition is that a compound or blanket policy is one which insures property collectively without providing in the event of a loss for a distribution of the insurance to each item. [Schmaelzle v. London Ins. Co., 75 Conn. 397, 96 Am. St. 233, 60 L. R. A. 536; 14 R. C. L. sec. 447, p. 1303; Kinzer v. Ins. Co., 88 Kan. 93, 43 L. R. A. (N. S.) 121; Comm. v. Mass. Ins. Co., 112 Mass. l. c. 121.] Under the terms of appellant's policies the several and separate interests of each individual owner of live stock while located in the yards, buildings, or on the grounds of the Kansas City Stock Yards, was insured as well as the interests of shippers and purchasers of such live stock while so located. The limit of the liability of appellant for the loss of each head of each class of this stock was stated, followed by

the proviso that this insurance was to have the same binding force and effect as if the names of the specific owners had been written in the policies.

In addition, the conditions and specifications of these policies are such as to confer the individual right of action upon each owner in the event of loss. The premium required to be paid but not the entire amount of the insurance is specifically stated. The latter is left to be determined from the liability proved, within the limits fixed by the policies and required to be paid as indemnity for the loss of each head of the kind of stock designated. In passing, it may be pertinent to say that the entire amount of the insurance is not necessary to be stated in a policy where the conditions of the contract are, as in this instance, dependent upon the amount to be covered and a definite method is prescribed by which the amount of the loss of each owner entitled to indemnity, may be ascertained. This conclusion finds approval in Bunten v. Orient Ins. Co., 8 Bosw. (N. Y.) 448, in which it is held that although the contract of insurance is contingent as to the amount to be covered as well as the rate of the premium, if a means is provided for ascertaining them with certainty the policy is valid. To a like effect is Concordia Fire Ins. Co. v. Heffron, 84 Ill. App. 610 and cases cited; 1 Joyce on Insurance (2 Ed.) sec. 49, p. 217.

The definite location of the property insured, its specific classification, the prescribed premium rate, and the definite limit of liability as applied to each head of stock belonging to a class, with the attendant right of action in each owner in the event of loss, authorize the classification of these policies as specific insurance. By this we mean a policy by the terms of which the insurance in the event of loss is to be distributed among the several items of property, a specific amount to each item. [1 Joyce, Ins. (2 Ed.) sec. 157a, p. 411 and notes; Am. Cent. Ins. Co. v. Landau, 62 N. J. Eq. 73; 31 Cyc. 905.]

The character of appellant's policies having been determined, in what manner is the Globe & Rutgers pol-

icy to be classified? It is contended that the designation in this policy of the name of the insured characterizes it as specific insurance. It will be enough to say perhaps in answer to this contention that it is not necessary to the validity of a contract of insurance that it contain the name of the insured. If described in any other manner by which his relation to the contract may be determined and his consequent right to indemnity may be ascertained, his name is not essential. [Weed v. Hamburg-Bremen Fire Ins. Co., 133 N. Y. 394; Weed v. London Fire Ins. Co., 116 N. Y. l. c. 114.] The character of a contract is not to be determined by a non-essential.

The Globe & Rutgers policy is indefinite as to the location of the property insured. This is usually regarded as essential. The territorial boundaries of the policy's application is the United States, excepting three specified locations in Kansas City, Kansas, Oklahoma City, Oklahoma and Long Island City, N. Y. As to the character of the property insured it comprises that of three distinct corporations and their subsidiaries, the property being designated under the general terms as "buildings, stock, materials and supplies, hogs, cattle, sheep and poultry, the property of the assured or held by them in trust or on commission or on consignment or sold but not delivered or for which they may be liable, including all other property not specifically mentioned herein." A gross amount of insurance and a gross premium is stated but no provision is made as to the amount of indemnity that is to be paid upon any item in any class in the event of loss. It will be seen from the facts that the distinctive characteristics of this policy are more in the nature of blanket than specific insurance. [Home Ins. Co. v. Warehouse Co., 93 U. S. l. c. 541; Am. Cent. Ins. Co. v. Landau, 62 N. J. Eq. 73.] However, under our interpretation of its terms it is not necessary to classify it as either. It expressly provides that it is "to be considered as surplus insurance when

there exists any specific insurance on the property insured and this insurance shall not apply or contribute until the amount collectible from all such specific insurance shall have been exhausted.'' The prescribed purpose of the policy as understood and agreed between the parties, ''is that the insured is to be reimbursed to the extent of the difference between the amount collectible from such specific insurance and the amount of the actual loss sustained by the insured not exceeding however the amount insured or in any event the limit of the loss as above stipulated.'' Not only therefore by the express agreement of the parties but in contemplation of law the Globe & Rutgers may be designated as a floating policy. The texts and cases tell us that a floating policy is one intended to supplement specific insurance on property and attaches only when the latter ceases to cover the risk. [Cutting v. Atlas Ins. Co., 199 Mass. 380; Peabody v. Liverpool Ins. Co., 171 Mass. 114; Bloch v. Am. Ins. Co., 132 Wis. 150.] The reason for the creation and the purpose of this character of policy is to provide indemnity for property which cannot because of its frequent change in location and quantity be covered by specific insurance. [Gross v. New York Co., 107 Fed. 516; Grossbaum Syndicate v. German Ins. Co., 213 Pa. 506; Fairchild v. Liverpool Ins. Co., 51 N. Y. 65; Klotz Tailor Co. v. Eastern Ins. Co., 102 N. Y. Supp. 82.]

Floating or surplus insurance is a form of indemnity not infrequently resorted to, especially when the property insured is of such a nature as not to admit of a gross valuation. By its terms it cannot become operative until the prior insurance has been exhausted. With this limitation blazoned on its face the Globe & Rutgers policy could not tend to increase the risk of the appellant or improperly excite the cupidity of the insured. It cannot be said therefore to constitute such ''other insurance whether valid or invalid'' as is held under different conditions to render nugatory the existing insurance

issued by the appellant. As this court said in Ober-
meyer v. Globe Mut. Ins. Co., 43 Mo. l. c. 577: "The con-
tract is to be enforced according to its spirit, not its
letter merely. Thus it is also well settled, though per-
haps not with the same unanimity, that if the second
policy, against which the contract stipulates, is itself a
void one, or one that cannot be enforced, it shall not
avoid the first, notwithstanding the clause of forfei-
ture." [Citing cases.] Under the ruling therefore in
the Obermeyer Case, to constitute a successful defense
in an action on an insurance policy, it should appear that
the policy relied upon to avoid the one containing the
condition of forfeiture was in existence and enforcible
at the time of the loss. It may be said in the light of
many cases that to render an existing policy void the
additional insurance must be valid and enforcible. [26
C. J. 261, note 43.] These conditions need not be co-
existent. Although it may be conceded that the Globe
& Rutgers policy is valid it is unenforcible: this condi-
tion of *innocuous inertia* utterly destroys its power to
affect appellant's policies. There is a rule of construc-
tion especially applicable to contracts of insurance that
stipulations in policies in the nature of warranties or
conditions are to be reasonably construed with reference
to the subject-matter and not captiously or literally.
[Houghton v. Ins. Co., 8 Metc. 114; Shaw v. Robberds,
6 Ad. & Ell. (Eng.) 75; Mayall v. Mitford, 6 Ad. & Ell.
(Eng.) 670.]

The condition here sought to be invoked by appellant
to invalidate its policies is, as we have shown, not one
which can in anywise affect its contract during the exist-
ence of the risk, but one which has reference only to a
matter subsequent to the loss. No substantial right of
the appellant could have been prejudiced by the Globe
& Rutgers policy, and it would shame justice to prevent
a recovery by the respondent on a filmy technicality which
will not stand the test of analysis and under its facts is
not sustained by any well-reasoned precedent.

Viewed from another point of vantage the futility of the appellant's contention in this behalf may be demonstrated. Under our statute (Sec. 6234, R. S. 1919), it is provided that: "The warranty of any fact or condition hereafter incorporated or made a part of any fire, tornado or cyclone policy of insurance purporting to be made or assented to by the assured which shall not materially affect the risk insured against, shall be deemed, taken and construed as representations only in all suits at law or in equity brought upon such policy in any of the courts of this State."

We have shown that the Globe & Rutgers policy was not material to the risk insured against by the appellant's policies; this being true, the condition of forfeiture in these policies constituted but a representation which did not invalidate them.

One of our Courts of Appeals in a well considered opinion by GOODE, J., holds that a stipulation against over insurance not material to the risk is but a representation and within the terms of the statute will not invalidate the policy. [Burge v. Greenwich Ins. Co., 106 Mo. App. 244.] To a like effect is the later case of Berryman v. Maryland Ins. Co., 199 Mo. App. 503.

VI.  Appellant's policies constitute specific insurance. The Globe & Rutgers policy does not. Therefore until the insurance contracted to be paid in the former is exhausted, the latter can have no application in so far as it may affect the binding force or manner of payment of the appellant's obligation. Under these facts the provision in appellant's policies concerning a prorating of the insurance is irrelevant and its consideration is unnecessary. For a like reason the instruction D-R, asked by the appellant and refused, in regard to the manner in which the insurance should be prorated, is eliminated from a discussion of the material facts in evidence from which the matter at issue should be determined. However in-

*Specific and Blanket Insurance.*

consistent therefore appellant's attitude may be in asking this instruction in view of its other defenses is of no concern in determining appellant's liability.

VII.   Appellant contends that error was committed in permitting respondent to establish the value of the cattle and calves lost by proving their value in groups, which was the manner in which they were purchased, instead of by the head. It was shown that the appraisal committee which adjusted the losses of others with the appellant in concurrence with its representatives estimated the loss by bunches or groups in all cases where cattle and calves were so bought or held at the time of the fire.   The testimony discloses it is a fact not unknown to those having even a superficial knowledge of the live stock business, that where stock is brought in groups as is usually the case at one price, they are classified as of the same weight and quality per head.   By such a classification a variance between individuals of the class is minimized and disregarded, in short the individual value of each head is established by taking the average value of the lot.   The learned trial judge rendered familiar with the custom and the relevant facts in regard to same being fresh in his mind, held that the method pursued in estimating the value of respondent's stock was not improper.   The record is barren of any evidence which it would have been permissible for the appellant to introduce, to show that the different bunches of cattle purchased, weighed and valued contained animals not all alike in quality and weight. Despite the showing as to the total amount of the jury's finding, it is contended that it is vulnerable in being excessive in that it contains calves listed by respondent which were valued in excess of fifty dollars per head, the maximum amount authorized by the policy for this class of stock.   This contention is based on the showing that four of the animals listed as calves in the respondent's account of purchases were valued in excess of the maximum, as follows:

*Valuation.*

Wilson Company v. Hartford Fire Insurance Co.

One weighing 1040 lbs. was valued at $78.00
,,    ,,    980 ,,    ,,    ,,    ,,    51.45
,,    ,,    650 ,,    ,,    ' ,,    ,,    52.00
,,    ,,    600 ,,    ,,    ,,    ,,    51.00

Appellant's statement concerning the above inadvertently omits a reference to the weight of each of these animals. The weights in our opinion are important in determining the correctness of the classification. If by the word calves as here employed, it is meant to include animals weighing 600 pounds or over the classification challenges controversy in that it is contrary to common knowledge as to what constitutes an animal of this character. The testimony, however, as to the use of the word in the parlance of live stock dealers and especially at stock yards, removes any question as to what is meant by the word as used in respondent's list. A bookkeeper for respondent testified that it was their custom in listing cattle and calves to list all live stock bought by calf buyers whether cattle or calves as calves; that the age or the weight of the animal did not influence its classification; and that in the preparation of the respondent's claim he followed that method in listing its property which had been lost.

Charles H. Hill, cattle buyer for respondent, testified on cross-examination as follows:

"Q. You don't know whether any of these cover calves or not; these tickets produced here? A. The only way I would know would be by the weight.

"Q. Now, apparently, some of these weights are for what are called cattle by Mr. Watson, or called calves by you; in presenting your claim is one for instance, of 980 pounds—is that properly classified at that weight? A. No, sir.

"Q. If an animal weighed that much, it is probably the custom to classify it as a calf? A. Yes; that's the custom. We usually speak of an animal weighing 300 pounds as a heavy calf; 300 to 350—we occasionally have some heavier, but as a rule, all our calves weigh around 200 to 250 pounds.

"Q. Well, now, among these so-called calves here I notice one of 590 pounds, one 640 pounds, another 450 pounds—are those fairly heavy to be classified as calves? A. Well as I said awhile ago, we sometimes buy what we call a heavy calf, but, as a rule, our calves weight from 200 to 300 pounds; but sometimes they run up heavier."

From this testimony it is evident that these four animals were in fact cattle and as such were well within the limitation of $150 per head as prescribed in the policy. The jury therefore was justified in thus classifying them regardless of the list. The propriety of the jury's action in this regard is emphasized by no objection thereto having been made by appellant during the trial.

The exhibits introduced in evidence showed the weight, price per pound and the amount paid for each animal included in respondent's claim. Some were purchased in lots as is customary in stockyard transactions, but the uncontradicted testimony was that when such purchases were made, the cattle would be uniform in price, weight and quality. It was shown that this manner of purchase and estimate of price results from the fact that live stock is first assorted by the commission firms, graded, and then offered for sale in classified lots. The most practicable way to ascertain the market value of the average animal in a lot is to divide the total cost of a particular lot of cattle by the number of head in the lot, and the result will give the price paid per head, or the reasonable market value of same. The finding complained of does not show that any head of respondent's cattle was valued in excess of $150, or any one calf was valued in excess of $50. In the case of four head as shown listed as calves, weighing in excess of 600 pounds per head, the amounts paid were in excess of $50, but, under the testimony, all of these should have been classed as cattle and not calves.

Reduced to its ultimate analysis the burden of this contention is that the manner in which the value of the stock lost or damaged was estimated, tended to increase the verdict. To entitle this contention to serious consideration it should have been shown, as it was not, that the maximum estimates of the value of the stock lost or damaged were such as to affect the total amount of he verdict. Respondent's petition alleged and the testimony, not attempted to be questioned, showed a total loss of 1434 head of cattle and calves of an estimated value within the terms of the policies of, $68,958.46, or less than one-half of the amount of the loss. Without comment, which is unnecessary, this finding does not appear to indicate an excessive verdict.

VIII. The non-application of the Globe & Rutgers policy excepting under the conditions stated therein renders unnecessary a discussion of its application dependent upon the nature of the loss. It will be enough to say that the damage contracted to be paid by this policy as indemnity to the respondent is for Sale of a loss or damage by fire. The exact language of same being as follows: "does insure Wilson & Co., Inc., . . . against all loss or damage by fire." Without intending to be captious it is pertinent to say that the learned and exhaustive discussion of this phase of the controversy by counsel of the respective parties is beside the case. This in view of the fact often reiterated that the Globe & Rutgers policy is not only limited in its application, but its payment is dependent upon a contingency which has not arisen and which may never arise; and that the appellant's policies without qualification as to their operative effect constitute a present and subsisting contract of indemnity and pledge the payment of loss by fire or from the mixing of the live stock of the respondent.

A discussion of the question as to the limitation of the appellant's right of defense in view of its sale of re-

spondent's property, its retention of the proceeds arising therefrom and its refusal to make reparation after being fully advised as to the terms of the Globe & Rutgers policy, might prove interesting from an academic standpoint, but it is unnecessary in view of the appellant's liability as shown by a review of the evidence.

It follows, therefore, from the conclusions we have reached as to each contention urged as error by the appellant, although ingeniously presented, do not reach the merits, that the judgment of the trial court should be affirmed. It is so ordered. All concur.